Robert A. BROWN; Glenbrook Capital
L.P.; George P. Drake; CN & L In-
vestment Corp.; and Andrew Kauf-
man, Plaintiffs,

v.

KINROSS GOLD, U.S.A.; Kinam Gold,
Inc.; Kinross Gold Corporation; and
Robert M. Buchan, Defendants.

No. CVS020605PMPRJJ.

United States District Court,
D. Nevada.

May 27, 2005.

Thomas F. Kummer, L. Joe Coppedge, Esq., Kummer Kaempfer Bonner & Renshaw, Las Vegas, NV, Merrill G. Davidoff, Michael Dell' Angelo, Berger & Montague, P.C., Philadelphia, PA, Reginald H. Howe, Belmont, MA, for Plaintiffs.

Kirk B. Lenhard, Jones Vargas, Las Vegas, NV, Robert S. Clark, Parr Waddoups Brown Gee & Loveless, Salt Lake City, UT, for Defendants.

### ORDER

PRO, Chief Judge.

Presently before the Court is Defendants' Motion for Judgment on Counts III (Best Price Rule) and IV (Nevada RICO) of Amended Class Action Complaint and For Correction of Basis for Dismissal of Count V ("Defs.' Mot. for Summ. J. Counts III, IV") (Doc. # 86) filed January 6, 2005. Plaintiffs filed a Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings on Counts III and IV and in Support of Plaintiffs' Cross Motion for Summary Judgment on Count III ("Pls.' Opp'n") (Doc. # 88) on January 26, 2005. Defendants filed a Reply (Doc. # 97) on February 28, 2005.

Plaintiffs filed Plaintiffs' Cross–Motion for Summary Judgment on Count III ("Pls.' Cross–Mot.") (Doc. # 89) on January 26, 2005. Defendants filed an Opposition (Doc. # 96) on February 28, 2005, as

well Defendants' Corrected and Amended Memorandum in Opposition to Plaintiffs' Cross–Motion for Summary Judgment on Count III (Best Price Rule) (Doc. # 99) on March 2, 2005. Plaintiffs filed a Reply (Doc. # 100) on March 11, 2005.

## I. BACKGROUND

In August 1994, Amax Gold ("Amax"), Kinam's predecessor, issued 1,840,000 shares of $3.75 Series B Convertible Preferred Stock ("Preferred") to the public. (Am. Class Action Compl. ¶ 24.) Amax issued the Preferred to raise necessary funds to continue the development of its "Fort Knox" gold mine in Alaska. (*Id.*) Shortly thereafter, the Preferred was listed on the New York Stock Exchange until August 2001, when its listing was transferred to the American Stock Exchange. (*Id.* ¶ 29.) On June 1, 1998, Kinross Canada acquired Amax. (*Id.* ¶ 37.) Amax then changed its name to Kinam and became a subsidiary of Kinross USA. (*Id.*) The Preferred, constituting three percent of Kinam's voting control, remained in the hands of third parties while Kinross USA owned all of the Kinam common stock. (*Id.* ¶ 40.) During the acquisition, Kinross Canada, through Kinross USA, advanced $256 million to Kinam, then recorded the $256 million as debt owed to Kinross USA, all of which was reported on Kinam's audited financial statements filed with the SEC. (*Id.* ¶ 42.) Kinross USA has carried the loan without charging interest or loan fees to Kinam. (*Id.*) The Fort Knox mines, developed with the issuance of the Preferred, provided Kinross with 40% of its gold production and 50% of its gold reserves. In total, the former Amax assets provided Kinross with approximately 75% of both its total annual gold productions and its total gold reserves. (*Id.* ¶ 84.)

After Kinross acquired Amax, the value of gold decreased, adversely affecting the Kinross organization. (*Id.* ¶ 46.) A Kinross press release attributed its losses to many factors, one of which was that the spot price of gold dropped significantly. (*Id.*) Defendants responded by suspending the quarterly dividends of the Preferred. (*Id.*) In November 2001, with six payments of dividends being in arrears, the Preferred would have become eligible to elect two additional directors to Kinam's Board of directors. (*Id.* ¶ 47.) In May 2001, Kinross moved Kinam's state of incorporation from Delaware to Nevada. (*Id.* ¶ 48.) This move prevented holders of the Preferred from bringing a petition to put Kinam into state insolvency proceedings. (*Id.* ¶ 50.) Insolvency would have allowed holders of the Preferred to apply for the appointment of a receiver. (*Id.* ¶ 48.)

On June 12, 2001, Defendants and Franklin Funds announced an agreement to exchange 800,000 shares of Preferred for 21.5 million common shares of Kinross USA. (*Id.* ¶ 56.) In the five days preceding the Franklin transaction, the average closing price of the Preferred was $8.025. (*Id.*) By the time of closing, however, the price of Kinross Canada stock had increased to an average price of $25.80 per share of Preferred. (*Id.*) On June 18, 2001, Kinross USA and Kinam announced agreements with two other holders of the Preferred to exchange over 2.6 million shares of Kinross' common stocks for 145,00 shares of the Preferred. (*Id.* ¶ 57.) The two other main shareholders exchanged their Preferred at a ratio that implied an effective price of $18.29 per share. (*Id.*) After these deals, Kinross USA owned 51.4% of the Preferred, thereby controlling 98.7% of the outstanding Kinam common and Preferred votes. (*Id.* ¶ 58.)

In February 2002, Kinross USA issued a Tender Offer to purchase all Preferred shares at $16.00 per share. (*Id.* ¶ 63.) Kinross USA made this offer after it made a bid to acquire 954,000 Preferred shares,

held mostly by the Franklin Funds. (*Id.* ¶ 56.) The Tender Offer disclosed that Kinam suspended the payment of dividends on the Preferred, and did not plan to resume payments in the near future based on the then current price of gold. (*Id.* ¶ 46.) The Tender Offer also discussed the fairness of the offer, stating that the Kinam Board had appointed a special committee to determine whether the $16.00 offer was fair to non-affiliated holders of Preferred shares. (*Id.* ¶ 62.) This committee consisted of directors of Kinross Canada who held equity positions. (*Id.*) The committee did not recommend whether the Preferred shareholders should accept the offer. (*Id.* ¶ 70.) Instead, the committee employed the firm of Raymond James, who had experience in the valuation of businesses and securities, to provide a fairness opinion. (*Id.* ¶ 62.)

In its review, Raymond James analyzed and reviewed the following: (1) Kinam's net asset value (determined to be between negative $73 million and negative $116 million); (2) Kinross Canada's and Kinam's financial statements from 1997 through 2003; (3) life of mine analysis, stock trading activity and prices, investment bank reports of the industry, and other similar tender offers; (4) discussions with Kinam's auditors and legal advisors; and (5) other "going-private" and "recent merger and acquisition transactions in the mining industry." (*Id.* ¶ 98.) Raymond James did not analyze a liquidation strategy because, according to Raymond James, the liabilities clearly outweighed the assets. (*Id.*) Based on Preferred's trading history, Raymond James concluded that an offer between $15 and $18 per share would represent a premium of between 68% and 101% over the 365–day average price. (*Id.* ¶ 74.) Raymond James concluded that the Tender Offer price was fair and within the range of values it had provided in its report. (*Id.* ¶ 70.)

At the conclusion of the Tender Offer period, Kinam Preferred shareholders tendered 652,992 shares or 73% of the outstanding 894,600 Preferred shares not previously owned by Kinross USA. (*Id.* ¶ 78.) Plaintiffs held interests in approximately 56,100 Preferred shares. (*Id.* ¶¶ 5–9.)

In the Amended Complaint, Plaintiffs allege Defendants breached their fiduciary duties in violation § 13(e), § 10(b)(5), and § 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act"), the state of Nevada's anti-racketeering law ("Nevada's RICO"), and the New York Stock Exchanges's Rule 311.03. (*Id.* at 2.) This Court dismissed with prejudice Plaintiffs' claims V (False Statements in Connection with the Tender Offer), VI (Scheme to Defraud in Violation of Rules 10b(a) and (c)), and VII (Section 20(a) of the Securities Exchange Act), on November 2, 2004. (Order dated Nov. 2, 2004.)

In the present motion, Defendants request this Court dismiss with prejudice Plaintiffs' claims III and IV. Plaintiffs' claim III alleges Defendants violated the "Best Price Rule" under § 13(e) of the Exchange Act and New York Stock Exchange Rule 311.03. Defendants argue that the two transactions on which Plaintiffs' allegations are based did not occur as part of the tender offer, thus they were not in violation of the Best Price Rule, and Plaintiffs' claim III should be dismissed with prejudice. Plaintiffs respond with Plaintiffs' Counter Motion for Summary Judgment on Plaintiffs' claim III, the Best Price Rule.

Plaintiffs argue that because the Franklin Transaction and the follow-on transactions constituted a tender offer in themselves, which, Plaintiffs allege, were in violation of § 13(e) and Rule 13e–4 of the Exchange Act, Plaintiffs are entitled to summary judgment on claim III, under the Best Price Rule.

In Plaintiffs' claim IV, Plaintiffs allege that Defendants violated Nevada's RICO by engaging in at least two crimes related to racketeering that have same or similar patterns. Plaintiffs argue "the multiple violations of the antifraud provisions of the federal securities laws alleged in Counts V and VI below constitute violations . . ." of Nevada's RICO law. (*Id.* at 48.) Additionally, Plaintiffs allege Kinross' acquisition of Amax Gold, resulting in the elimination of most or all of its debt would violate Nevada securities law, and would constitute a further predicate act under Nevada's RICO law. (*Id.*) Defendants argue that because the Court dismissed Plaintiffs' claims V and VI, Plaintiffs have no claim under Nevada's RICO statute as a matter of law. Plaintiffs respond that even absent the predicate acts in claims V and VI, dismissed by this Court, claim IV of Plaintiffs' Amended Class Action Complaint adequately alleged predicate acts based on violations of Nevada state securities law and obtaining property by false pretenses to satisfy the requirements of Nevada's RICO law.

Finally, Defendants request this Court modify the basis on which this Court dismissed Plaintiffs' claim V in the Order dated November 2, 2004. Defendants argue this Court's conclusion that Plaintiffs did not tender any shares of the 3.75 Series B Convertible Preferred Stock was correct as to Plaintiffs Robert A. Brown ("Brown"), Glenbrook Capital LP ("Glenbrook"), and Peter Tsurekidis ("Tsurekidis"). However, Defendants assert that the basis for this Court's decision should be corrected as to Plaintiffs George P. Drake ("Drake"), CN & L Investment Corporation ("CN & L"), and Andrew D. Kaufman ("Kaufman") because they allegedly tendered shares in response to the Tender Offer. Defendants argue the dismissal should, nevertheless, be upheld based on Plaintiffs' failure to allege facts establishing scienter. Plaintiffs agree with

Defendants' analysis that the basis for this Court's Order was flawed as to half of the Plaintiffs, however Plaintiffs argue that rather than correct the Court's error, the Court must reconsider fully Defendants' motion for judgment as a matter of law on counts V and VI. Specifically, Plaintiffs argue that the mistakes underlying Defendants' proposed corrections demonstrate the infirmities of this Court's original Order.

## II. LEGAL STANDARD

When the pleadings are closed a party may move for judgment on the pleadings. *See* Fed.R.Civ.P. 12(c). A motion for judgment on the pleadings based on a failure to state a claim upon which relief may be granted is essentially treated as a Rule 12(b)(6) motion to dismiss. *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir.1989). A judgment on the pleadings is appropriate "when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Yanez v. United States*, 63 F.3d 870, 872 (9th Cir.1995). For purposes of a motion for judgment as a matter of law, the court accepts as true the non-moving party's allegations. *See Austad v. United States*, 386 F.2d 147, 149 (9th Cir.1967). Additionally, under the incorporation by reference doctrine, the Court may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to it. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999).

## III. DISCUSSION

### A. BEST PRICE RULE (COUNT III)

Defendants assert that Count III should be dismissed as a matter of law. Accord-

ing to Defendants, the Franklin Transaction and Follow–On transactions were not a part of the Tender Offer, therefore Defendants were not obligated to offer the Plaintiffs the same consideration as that paid during the Franklin and Follow–On transactions. Defendants further argue that even if their actions constituted a violation of the Best Price Rule, Plaintiffs Brown, Glenbrook, and Tsurekidis would have no right to such a claim because they lack standing to assert this claim.

Plaintiffs respond that they are entitled to judgment on Count III because the Franklin Transaction and the follow-on transactions constituted a tender offer and also were an integral part of the cash tender offer. Plaintiffs claim they were not offered the same consideration that was offered in the original transactions.

■■■■ Securities Exchange Commission ("SEC") Rule 13e–4 codifies the Best Price Rule. The rule provides, in pertinent part, that:

(f) Manner of making tender offer....

(3) If the issuer or affiliate makes a tender offer for less than all of the outstanding equity securities of a class, and if a greater number of securities is tendered pursuant thereto than the issuer or affiliate is bound or willing to take up and pay for, the securities taken up and paid for shall be taken up and paid for as nearly as may be pro rata, disregarding fractions, according to the number of securities tendered by each security holder during the period such offer remains open . . . .

(8) No issuer or affiliate shall make a tender offer unless:

(i) The tender offer is open to all security holders of the class of securities subject to the tender offer, and . . .

(ii) The consideration paid to any security holder pursuant to the ten-

der offer is the highest consideration paid to any other security holder during such tender offer...

17 C.F.R. 240.13e–4. To determine the existence of a tender offer, the Ninth Circuit applies an eight-factor test:

(1) Active and widespread solicitation of public shareholders for the shares of an issuer; (2) solicitation made for a substantial percentage of the issuer's stock; (3) offer to purchase made at a premium over the prevailing market price; (4) terms of the offer are firm rather than negotiable; (5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased; (6) offer open only for a limited period of time; (7) offeree subjected to pressure to sell his stock; [and (8) ] public announcements of purchasing program concerning the target company precede or accompany rapid accumulation of a large amount of target company's securities.

*SEC v. Carter Hawley Hale Stores, Inc.,* 760 F.2d 945, 950 (9th Cir.1985). Not all factors need be present to find a tender offer; rather, they provide some guidance as to the traditional indicia of a tender offer. *Id.* Private tenders of stock may be considered part of a public tender offer for purposes of the Best Price Rule if they are conditioned upon the success of a tender offer. *Epstein v. MCA, Inc.,* 50 F.3d 644, 656 (9th Cir.1995).

■■■ After examining the *Wellman* factors, the Court concludes that the Franklin and Follow–On Transactions do not constitute either a tender offer in themselves or an integral part of the public cash tender offer. Plaintiffs argue that the requirement of active and widespread solicitation of public shareholders is satisfied because Defendants issued a press release about the Franklin Transactions, and that two more investors subsequently approached

Defendants and sold their Preferred shares. In support of this argument, Plaintiffs submit a memorandum from Gord McCreary, Kinross' then Vice–President of Investor Relations and Corporate Development, to Robert Buchan, Kinross' President and Chairman of the Board, regarding the Franklin and Follow–On Transactions. The memorandum reveals that Buchan authorized McCreary to offer thirty-three (33) cents on the dollar to a small number of holders of the Preferred if they called as a result of the press release announcing the Franklin Transaction. (Pl.'s Mot. for In Camera Inspection of a Supp. Doc. (Doc. # 107) Ex. A.) According to Plaintiffs, this memorandum confirms that Defendants were aware that the June 12, 2001 press release was a solicitation and would cause holders of the Preferred to request to tender shares. Plaintiffs further argue that this memorandum shows that Defendants intended to engage in a continuing tender offer by empowering McCreary to purchase additional shares.

However, the press release did not solicit public shareholders; it merely announced the transaction with Franklin Funds. Even if the announcement could constitute solicitation, this case does not rise to a level of active and widespread solicitation. Defendants approached only the Franklin Funds, and no other individual shareholders. The memorandum does not suggest any conclusion other than the fact that Defendants anticipated that the announcement of the Franklin Transaction would trigger offers from other investors to tender shares.

The Franklin and Follow–On Transactions further resemble private transactions rather than a tender offer because the transactions were the result of negotiation. A transaction tends to resemble a tender offer if the terms are firm rather than negotiable. Here, Plaintiffs acknowledged that the Franklin Transaction resulted from extended and acrimonious negotiations between Defendants and Franklin.

Another characteristic of a tender offer is that the offer is made contingent on the tender of a fixed number of shares, where the offeror often announces the maximum number that it will purchase. Here, Plaintiffs do not allege that at any time Defendants announced a maximum number of shares it would acquire.

The transactions at issue also do not tend to support a finding that they are tender offers because Plaintiffs have not shown that Defendants made an offer only for a limited period of time. Again, Plaintiffs' own allegations recognized that the negotiations were extended and acrimonious. However, Plaintiffs contend Defendants held the open the offer for a limited time because the transactions were effected in a time frame of less than one week. This argument ignores the fact that negotiations continued for six months. Defendants and Franklin Funds even agreed to toll the statute of limitations on a potential claim to negotiate the terms of the transaction.

Another factor that weighs against the transactions being classified as tender offers is the fact that the Franklin and Follow–On Transactions did not involve pressure to sell stock. These transactions involved institutional investors who negotiated a favorable price for the shares that they owned. Further, Defendants did not initiate the Follow–On Transactions.

Finally, Plaintiffs assert that the transactions were part of a single plan of acquisition, and thus should be subject to the Best Price Rule. However, private transactions are considered functionally part of a public tender offer only when they are contractually conditioned on the success of the tender offer. Here, the Franklin and Follow–On Transactions were completed

over six months prior to the tender offer, and were not conditioned on the success of the tender offer. The private transactions stood independent of the tender offer. Accordingly, the transactions are not subject to the Best Price Rule. The Court therefore will dismiss Count III of Plaintiffs' Complaint.

## B. NEVADA RICO STATUTES (COUNT IV)

Defendants contend Plaintiffs' claim under the Nevada RICO statute must fail because the Amended Complaint fails to plead two crimes relating to racketeering. According to Defendants, Plaintiffs' fraud claims cannot provide the two crimes relating to racketeering because this Court's Order dated November 2, 2004 dismissed those claims. Defendants further note that Plaintiffs' allegations regarding Kinross' statement about the elimination of Kinam's debt do not satisfy the statute's requirement of two crimes. Plaintiffs respond that in the Amended Complaint, Plaintiffs alleged that Defendants engaged in a coordinated scheme comprised of three components: (1) Kinross' representation in connection with the 1998 merger that "US$335 million of Amax Gold debt will be eliminated" and its subsequent failure to deliver on that promise; (2) Kinross' deliberate weakening of Kinam's balance after the merger so as to saddle the Preferred with virtually all of Amax Gold's former debt; and (3) Kinross' misrepresentation of the true value of Kinam in connection with the Tender Offer. According to Plaintiffs, these acts are sufficient to violate Nevada's RICO statute.

■ To state a claim under Nevada's RICO statute, a plaintiff must allege that the defendant "engag[ed] in at least two crimes related to racketeering that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents . . . ." Nev.Rev.Stat. § 207.390. A plaintiff must plead the two crimes relating to racketeering with specificity. *Hale v. Burkhardt*, 104 Nev. 632, 764 P.2d 866, 869–70 (1988). A "crime relating to racketeering" or predicate act includes "obtaining possession of money or property valued at $250 or more . . . by means of false pretenses" as well as "[a]ny violation of NRS 90.570" prohibiting fraud, deceit, and materially false or misleading statements "in connection with the offer to sell, sale, offer to purchase or purchase of a security . . . ." Nev.Rev.Stat. § 207.360. To attain standing, a plaintiff must allege injury that flowed from the violation of a predicate RICO act. *See Allum v. Valley Bank of Nev.*, 109 Nev. 280, 849 P.2d 297, 299 (1993). However, a plaintiff is not required to allege any injury separate and distinct from the harm caused by the predicate acts themselves. *Hale*, 764 P.2d at 868.

■ Plaintiffs rely largely on the allegations regarding the federal securities claims to comprise their claims under the Nevada RICO Act. Plaintiffs also allege that Defendants' misrepresentation of their intention to eliminate Amax Gold's debt in 1998 constitutes a predicate act that entitles Plaintiffs to a Nevada RICO claim. Plaintiffs' allegations regarding the debt does not qualify as a predicate act under either a theory of securities fraud, or a theory of obtaining property by false pretenses, because they did not part with any money or shares of Preferred in reliance on the statement regarding the elimination of Amex Gold's debt. Even if this allegation qualified as a predicate act, Plaintiffs fail to successfully allege a claim under the Nevada RICO statute. This Court dismissed the federal securities claims in its Order dated November 2, 2004. Plaintiffs fail to allege two crimes

relating to racketeering, and therefore fail to state a claim under Nevada's RICO Act. The Court will grant Defendants' motion for judgment on the pleadings with respect to Count IV.

### C. RECONSIDERATION OF PRIOR ORDER (COUNTS V AND VI)

In an Order dated November 2, 2004, the Court held that Plaintiffs lack standing to assert a claim under Section 10(b) of the Securities Exchange Act and Rule 10b–5(b) because they did not tender any shares of the Preferred in response to the Tender Offer. (Order dated November 3, 2004 (Doc. # 83), at 7.) Defendants request the Court modify its basis for granting judgment on the pleadings in favor of Defendants with regard to Plaintiffs Drake, CN & L, and Kaufman, because they allegedly tendered some of their Preferred shares in response to the Tender Offer. According to Defendants, although the aforementioned Plaintiffs alleged that they tendered shares in response to the Tender Offer, dismissal was proper because Plaintiffs failed to plead facts that would establish scienter under the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Plaintiffs acknowledge the Court's error. However, Plaintiffs respond that the Court should not revisit its Order except on full reconsideration of all matters at issue.

 Reconsideration of a prior ruling is appropriate only in limited' circumstances, such as the discovery of new evidence, an intervening change in controlling law, or where the initial decision was clearly erroneous or manifestly unjust. *Nunes v. Ashcroft,* 375 F.3d 805, 807–08 (9th Cir. 2004). A motion for reconsideration is not an avenue to re-litigate the same issues and arguments upon which the court already has ruled. *Brogdon v. Nat'l Healthcare Corp.,* 103 F.Supp.2d 1322, 1338 (N.D.Ga.2000).

 It is undisputed that the Court inadvertently erred in holding that Plaintiffs Drake, CN & L, and Kaufmann lacked standing because they did not tender shares in response to the Tender Offer. Plaintiffs allege in the Amended Complaint that Plaintiffs Drake, CN & L, and Kaufmann tendered shares in response to the Tender Offer. The forced seller doctrine therefore is not the correct basis for dismissal as to these Plaintiffs.

Although Plaintiffs Drake, CN & L, and Kaufmann allegedly tendered shares in response to the Tender Offer, dismissal was proper because Plaintiffs failed to plead facts that would establish scienter under the heightened pleading standard. In its Order dated November 3, 2004, the Court dismissed Count VI of Plaintiffs' Complaint for failure to allege scienter with particularity. (Order dated November 3, 2004 (Doc. # 83), at 11.) The Court reasoned that Plaintiffs' recitation of Defendants' motives for their actions was insufficient to satisfy the pleading requirements of the PSLRA. This reasoning applies with equal force to Plaintiffs' Count V claims, as the same facts and motives were offered as Plaintiffs' allegations of scienter. The Court therefore will modify its November 3, 2004 ruling to reflect that dismissal is improper under the forced seller doctrine with respect to Plaintiffs Drake, CN & L, and Kaufmann. Dismissal nevertheless is appropriate with respect to Plaintiffs Drake, CN & L, and Kaufmann because they failed to allege scienter with particularity.

### IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion for Judgment on Counts III (Best Price Rule) and IV (Nevada RICO) of Amended Class Action Complaint and For Correction of Basis for Dismissal of Count V (Doc. # 86) is

GRANTED. Counts III and IV of Plaintiffs' Complaint are hereby dismissed.

IT IS FURTHER ORDERED that the Court's Order dated November 3, 2004 (Doc. # 83), dismissing Plaintiffs Drake, CN & L, and Kaufmann's claims under Count V is hereby amended to reflect that Plaintiffs failed to plead with particularity facts that would establish scienter.

IT IS FURTHER ORDERED that Plaintiffs' Cross–Motion for Summary Judgment on Count III (Doc. # 89) is DE-NIED.